UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| | Criminal No. 3:12cr157 (JBA) |
| *v.* | |
| ROBERT BRADDOCK, JR., | |
| | August 14, 2013 |

**RULING ON POST-TRIAL MOTIONS**

On July 25, 2012, a Grand Jury returned a Superseding Indictment [Doc. # 21] in *United States v. Braddock et al.*, 3:12cr157, charging Defendant Robert Braddock, Jr. with conspiracy[1] to cause false statements to be submitted to the Federal Election Commission (the "FEC") and to defraud the United States in violation of 18 U.S.C. § 371 (Count One), accepting illegal conduit contributions to a candidate for federal office in violation of 2 U.S.C. §§ 437g(d)(1)(D)(i) and 441f, and 18 U.S.C. § 2 (Count Five), and causing the submission of false statements to the FEC in violation of 18 U.S.C. §§ 1001 and 2 (Count Six). On May 21, 2013, following a five-day trial, the jury returned a verdict convicting Mr. Braddock on all three of these counts. Defendant now moves [Doc. # 260] pursuant to Federal Rule of Criminal Procedure 29 for judgment of acquittal, and [Doc. # 261] pursuant to Federal Rule of Criminal Procedure 33 to vacate his conviction and for a new trial. For the following reasons, Defendant's motions for judgment of acquittal and for a new trial are denied.

---

[1] Benjamin Hogan, David Moffa, Daniel Monteiro, Joshua Nassi, Paul Rogers, and George Tirado were also charged as members of the conspiracy described in Count One of the Indictment. Harry Raymond Soucy was alleged to have been a member of the conspiracy, but was charged separately.

## I.       Summary of the Evidence

The following is a summary of the evidence presented to the jury at Mr. Braddock's trial:

Harry Raymond Soucy, an alleged member of the conspiracy charged in Count One, testified that on November 2, 2011 he met with several Roll-Your-Own ("RYO") smoke shop owners and told them that if they wanted to have their concerns regarding potential legislation to regulate the RYO industry addressed, "politics cost money" and that $10,000 was a good starting figure.  He further testified that he contacted the Speaker of the Connecticut House of Representatives, Christopher Donovan, and his Campaign Manager, Joshua Nassi, to set up a meeting.  Mr. Soucy testified that he instructed the RYO smoke shop owners to provide a series of $2,500 checks to the Donovan for Congress Campaign Committee (the "Campaign Committee"), but that these checks should be written in other people's names to "keep the tobacco industry off of it."  Mr. Soucy testified that the first of these checks was delivered at a November 15, 2011 fundraiser at the City Hall Café, and that during this fundraiser, he and Paul Rogers, the owner of a RYO smoke shop, spoke with Mr. Braddock, the Finance Director of Speaker Donovan's congressional campaign, stating that they would donate at least $10,000 of RYO money to the Campaign Committee but that the RYO owners' names would not be on the contribution checks.  The jury also heard a recorded phone conversation between Paul Rogers and Patrick Castagna, who was cooperating with the Government, corroborating this version of events:

> Paul Rogers:   Yup, yup.  And then, ahh, we already talked to ahh, we talked to ahh, this guy tonight.  And we talked to his Finance Director tonight, and ahh, and they've already discussed in great de-, great detail about you know their strategy for the whole thing, so.

| | |
|---|---|
| Patrick Castagna: | Do they, do they know about the smoke shop? Did you guys explain anything to them? |
| Paul Rogers: | We explained everything to them. |
| Patrick Castagna: | You did? |
| Paul Rogers: | The Finance Director . . . . And then, and then this guy pulled us aside. Said tomorrow, just, just, just, ahh, the Finance Director pulled us aside, said listen, tomorrow there is always people following this guy around, watching what he's doing and everything. |
| Patrick Castagna: | Right. |
| Paul Rogers: | And, so tomorrow just discuss, like, ahh, like our stuff. Don't talk about a bill, don't talk about anything. |

(Gov't's Ex. 1.)  The Government also offered emails between the Assistant Finance Director for Speaker Donovan's congressional campaign, Sara Waterfall, and Mr. Braddock in which Mr. Braddock attributed the RYO conduit contribution received at the City Hall Café fundraiser to Mr. Soucy.  (*See* Gov't's Exs. 6–8.)

Ms. Waterfall testified that one of her responsibilities as Assistant Finance Director was to enter donor information into the campaign's database, and that the Campaign Committee used an outside firm to generate its mandatory FEC reports using the information in this database.  This testimony was corroborated by the testimony of the Campaign Treasurer, Jeffrey Freiser, who stated that it was the campaign staff's responsibility to enter information into the database accurately because this information was not independently verified by the firm generating the reports.  Ms. Waterfall testified that Mr. Braddock had trained her for her position, and explained the various FEC requirements that the Campaign Committee would need to comply with.  To corroborate this testimony, the Government also entered into evidence an email Mr. Braddock sent to Ms. Waterfall discussing an upcoming FEC filing deadline, and Mr. Braddock's biography from his campaign finance consulting firm's website, in which he described himself as a "politically savvy" and accomplished finance director.  (*See* Gov't's Exs. 26,

124.)  Ms. Waterfall testified that Mr. Braddock assigned her the task of entering the biographical information of campaign contributors into the database, that he understood how the database functioned, and that they worked together to ensure that information was properly entered into the database.  Ms. Waterfall also testified that she understood that the information she was entering into the database would end up on the Campaign Committee's FEC reports.  Ms. Waterfall testified that she entered the information from the conduit checks provided by Mr. Soucy from the RYO owners into the database.  The jury saw copies of the FEC reports that the Campaign Committee had filed with the FEC that included the information contained on those checks.  (*See* Gov't's Exs. 104, 111.)  Ms. Waterfall also testified that Mr. Braddock instructed her to let him handle the campaign's interactions with Mr. Soucy.

Mr. Soucy testified that he provided additional conduit contributions to Mr. Braddock after a November 16, 2011 breakfast meeting with Speaker Donovan, and at a December 8, 2011 fundraiser at the Marriot Hotel.  The jury heard a recording of this event, showing that Mr. Soucy had handed the checks to Mr. Braddock, explaining that they were the "other half [of the] ten," to which Mr. Braddock replied "Okay, thanks buddy."  (Gov't's Ex. 21.)  Later that evening, Mr. Braddock approached the RYO smoke shop owners and Mr. Soucy and said "I think you're gonna be fine. . . . I wouldn't go repeating what I just said, but I think you're gonna be fine."  (*Id.*)  The jury heard a separate recording of a phone conversation between Mr. Rogers and George Tirado, an RYO owner, in which Mr. Rogers reported on the events of the prior evening:

> I mean, I thought it went excellent.  That Rob [Braddock] came up and was like, ah, you know, he went and gave him the things, he said, "thanks." Then he comes up later, he goes, "Yeah we been talking."  He goes, you know, I forget his exact words, he goes, ahh, you know, "I'm pretty, I'm

pretty sure you're going to be alright," or "I think you're going to be alright."

(Gov't's Ex. 22.)

The jury also heard testimony and recordings regarding additional conduit contributions provided to the Campaign Committee in April 2012. In several calls with Mr. Nassi, Mr. Soucy informed him that he had additional RYO checks and set up a meeting to provide those checks to Mr. Nassi and Mr. Braddock. On March 27, 2010, Mr. Soucy spoke with Mr. Nassi to let him know that "them people are coming back into town next week . . . and they're gonna have some more pieces of paper." (Gov't's Ex. 31.) Mr. Soucy testified that he was referring to the RYO smoke shop owners and checks in this conversation. Mr. Nassi replied "Alright. The, uh, the end of the week is an important deadline for us. And I know you talked to Rob on Friday about the . . . Alright man alright. A-anything that you can do before the end of the week, we would greatly appreciate." (*Id.*) On April 3, 2012, the two spoke again to set up a meeting at Spartan's II restaurant on April 11, 2012 to deliver the checks. (Gov't's Ex. 32 ("Um, I need to be able to get together with Rob. . . . Um, I'm going to have something for him.").) On April 9, 2012, Mr. Soucy contacted Mr. Braddock to confirm the meeting, telling him "I got, uh another ten grand for you," to which Mr. Braddock replied "You're the f*cking man, man. I'll be there." (Gov't's Ex. 38.) Mr. Soucy also cautioned that Speaker Donovan should not attend the meeting, and Mr. Braddock agreed. (*See id.*)

The jury heard testimony from several witnesses, including undercover FBI Special Agent John Keelan, regarding the events of the April 11, 2012 meeting at Spartan's II. The Government also offered into evidence a recording of the meeting. (*See* Gov't's Ex. 40.) During the dinner, Special Agent Keelan, posing as an RYO investor, voiced his

concerns regarding potential legislation to regulate the RYO industry. Mr. Braddock told him, "Just be worried about what you can control and we will relay your concerns to the appropriate individuals." (*Id.*) Special Agent Keelan testified that later on in the dinner, he handed four $2,500 checks to Mr. Braddock, stating "I'm not on any of those but if you think a more o- public, um showing from roll-your-own then, then that's fine. I, I was just under the understanding that I thought it might be sensitive if if we're out there then that may be more of a red flag." (*Id.*) Special Agent Keelan also noted that "there are no duplicates in here from, from last time that would raise a red flag," referring to the previous conduit contributions the RYO smoke shop individuals had provided to the Campaign Committee. (*Id.*) Special Agent Keelan testified that Mr. Braddock was listening to these statements and appeared to understand that Special Agent Keelan was describing the conduit nature of the contributions.

The Government presented evidence that one of the straw checks that Special Agent Keelan provided to Mr. Braddock bounced. (*See* Gov't's Ex. 42.) When Mr. Nassi called Mr. Soucy on April 23, 2012 to inform him that Dana Graziano's check had bounced and that they needed a replacement by midnight the next night, Mr. Soucy remarked that "everybody [who wrote a check] was given the cash to deposit." (Gov't's Ex. 43.) Ms. Graziano testified that Mr. Soucy and Mr. Rogers had previously given her $2,500 and instructed her to write out a check for that amount to the Campaign Committee. She testified that Mr. Rogers called her and informed her that the check she wrote had bounced and instructed her to get a bank check and drop it off at the RYO smoke shop in Waterbury. Gus Melita, a campaign employee who was not alleged to be involved in the conspiracy, testified that on April 24, 2012, he was sent to the RYO smoke shop in Waterbury to pick up a "package." Mr. Melita testified that the "package" he

picked up was an envelope containing a $2,500 bank check made out to the Campaign Committee and $100 in cash. Mr. Melita testified that he then returned to the campaign office and handed the check and the cash to Mr. Braddock and Ms. Waterfall. Ms. Waterfall testified that when she asked Mr. Braddock how she should attribute the $100, he told her not to worry about anything beyond the $10 to cover the bank fee.

The jury heard evidence that in late April and early May 2012, Mr. Soucy contacted Mr. Nassi to inform him that the RYO smoke shop owners would provide an additional $10,000 in conduit contributions to the Campaign Committee if Speaker Donovan kept the RYO legislation "off of the table" for the remainder of the legislative session. (Gov't Ex. 52; *see also* Gov't Ex. 63.) The legislative session closed on May 9, 2012, without the RYO legislation being taken up. On May 14, 2012, Mr. Soucy and Mr. Nassi spoke regarding the delivery of the additional checks. (*See* Gov't Ex. 64.) They discussed the possibility that Mr. Soucy could meet with Speaker Donovan before the State Democratic Convention that evening. Mr. Soucy stated that he had to "put together ya know the whatever dope addicts and drug pushers are gonna be writing out these phony checks," but that he wanted to "meet with Chris and thank him personally." (*Id.*).

Mr. Soucy testified that he attended the State Democratic Convention that evening, after previously having picked up four checks written by straw donors, and delivered the contributions to Mr. Nassi after a brief meeting with Speaker Donovan. The jury saw a video recording made covertly by Mr. Soucy as part of his cooperation with the Government (*see* Gov't Ex. 66), in which Mr. Soucy met with Mr. Rogers at the Waterbury smoke shop to pick up the checks before driving to the convention. In the recording, Mr. Soucy also can be seen at the convention approaching Speaker Donovan, who told Mr. Soucy "I took care of ya didn't I." (*Id.*) After a brief conversation with

Speaker Donovan, Mr. Soucy told Mr. Nassi that he "had an envelope for [him]," and the two stepped into a back room where Mr. Soucy handed Mr. Nassi an envelope containing the four straw checks. Mr. Soucy testified that he ran into Mr. Braddock on his way out of the convention. In the recording of the event, Mr. Soucy and Mr. Braddock are heard having the following conversation:

> Mr. Soucy:     Step into my office for a minute.
> Mr. Braddock: Sure.
> Mr. Soucy:     I just ran in to thank the man.
> Mr. Braddock: Okay.
> Mr. Soucy:     Um, 20,000 was well worth it. And another ten grand . . .
> Mr. Braddock: You're the man.

(*Id.*)

Ms. Waterfall testified at trial that the four checks Mr. Soucy delivered on May 14, 2012 did not have sufficient information on them for the Campaign Committee to properly update its database, and that she asked Mr. Braddock to contact Mr. Soucy in order to get the required information. The jury heard recordings of several telephone conversations between Mr. Braddock and Mr. Soucy in which they discussed the biographical information regarding the donors listed on the checks Mr. Soucy had delivered at the convention. (*See, e.g.*, Gov't's Exs. 67, 69–71, 73, 75.) During one of these phone calls Mr. Soucy stated that "the last time, one of these *sshole, drug addicts bounced a check even though we put the f*cking money right in their hand," to which Mr. Braddock replied "Correct." (Gov't's Ex. 70.) During the same call, Mr. Braddock said that he had been looking up the biographical information of one of the conduit contributors because he had to do "this reporting sh*t." (*Id.*) In a second call Mr. Soucy repeated the statements he had made regarding the conduit nature of the contributions he had been providing:

| | |
|---|---|
| Mr. Soucy: | You know, the last time one of these *ssholes bounced a check even though you put the money right in their hands. You know? |
| Mr. Braddock: | Ok. Alright. |
| Mr. Soucy: | Can't trust the drunks. Hey, you know, you know, grabbing these drunks and drug addicts and say "Here, write this check." People that they know. You know, so. |
| Mr. Braddock: | Ah. God. |
| Mr. Soucy: | Hey, you know. |
| Mr. Braddock: | Hey, it works. |

(Gov't's Ex. 71.)

Later that day, Mr. Soucy spoke with Mr. Braddock to inform him that one of the checks he had delivered was in the name of Benjamin Hogan, an employee of the RYO smoke shop:

| | |
|---|---|
| Mr. Soucy: | I was talking with Paulie and that Ben Hogan guy. |
| Mr. Braddock: | Yeah. |
| Mr. Soucy: | He is like one of the owners, alright. |
| Mr. Braddock: | Okay. |
| Mr. Soucy: | You wanna tear that one up and, um, I'll get, get another one? Or get, get that, that's one of the bank checks so get that back, and . . . |
| Mr. Braddock: | I gotta, I gotta hang up with you right now. She's on her way to the f*cking bank to deposit it right now. |
| Mr. Soucy: | Oh, alright. |
| Mr. Braddock: | Let me go. Let me call, let me see if I can get her. I'll call you right back. |

(Gov't's Ex. 73.) Ms. Waterfall testified that around the time of this call, she had sent an email to Mr. Braddock informing him that she was about to deposit the campaign donor checks. (*see* Gov't's Ex 72), but that about ten minutes after she sent the email, Mr. Braddock called her cell to ask if she had left for the bank yet. She testified that his voice sounded "urgent" on the phone. Ms. Waterfall testified that Mr. Braddock came into her office about thirty seconds after she hung up the phone and instructed her to pull Mr.

Hogan's check from the deposit. She testified that when she asked why the check needed to be pulled, Mr. Braddock told her that the check was from an RYO owner, and when she asked why that mattered he told her to "just do it." Ms. Waterfall testified that she pulled the check and that Mr. Hogan's contribution was not included on the campaign's FEC report as a result.

The jury also heard recordings of conversations between Mr. Soucy, Mr. Braddock, and Mr. Nassi in which they discussed the arrangements for replacing Mr. Hogan's check with another in the name of John Garcia. Mr. Braddock called Mr. Soucy after speaking to Ms. Waterfall and informed him "Well, we're all good." (Gov't's Ex. 75.) Mr. Soucy responded that he would pick up Mr. Hogan's check from Mr. Braddock and "do a switch" with the replacement check. (*Id.*) The next day, Mr. Soucy spoke with Mr. Braddock to inform him that he was on his way to the smoke shop to "pick it up." (Gov't's Ex. 78.) Mr. Braddock asked if Mr. Soucy wanted him "to have someone try to meet" Mr. Soucy at the store, and promised to call back if he could arrange it. (*Id.*) Mr. Soucy called Mr. Braddock back later that day, and Mr. Braddock transferred the call to Mr. Nassi, who arranged to exchange the checks that evening at Spartan's II. (*See* Gov't's Ex. 81.) The Government introduced a recording of the meeting where the exchange took place. (*See* Gov't's Ex. 82.)

## II.     Legal Standard

"A Rule 29 motion [for a judgment of acquittal] should be granted only if the district court concludes there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (internal quotations omitted). The Court must view the evidence presented at trial in the light most favorable to the Government, and draw all reasonable inferences in

its favor." *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008). "[I]t is well settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *Id.* at 99 (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). "The Court must give full play to the right of the jury to determine credibility." *Id.* "A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotations and citations omitted).

Under Federal Rule of Criminal Procedure 33, the Court has the discretion to grant a new trial "if the interest of justice so requires," particularly where there is "a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005). "In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses," *Cote*, 544 F.3d at 101, but "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). While courts have broader discretion to grant a new trial under Rule 33 than to grant an acquittal under Rule 29, "courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary of circumstances." *Id.*

## III.   Discussion

### A.  Judgment of Acquittal

Defendant moves for a judgment of acquittal on the grounds that the evidence presented by the Government at trial was insufficient to sustain a conviction on any of the Counts in the Indictment. Specifically, Defendant argues that (1) "the Government insufficiently proved an existence of a conspiracy;" (2) "the Government insufficiently

proved that Mr. Braddock accepted conduit contributions;" and (3) "the Government insufficiently proved with any competent evidence that he directly or indirectly provided false statements to the Federal Election Commission." (Def.'s Mem. Supp. [Doc. # 260-1] at 3.) The gravamen of Defendant's argument is that the Government's case was based on the circumstantial, uncorroborated testimony of cooperating witnesses, and as such, his conviction could only have been the result of spillover prejudice from the evidence against the other individuals involved in the conspiracy.

### 1. Count One – Existence of and Membership in the Conspiracy

In order to find Mr. Braddock guilty of Count One (Conspiracy to Commit an Offense Against and to Defraud the United States), the jury was instructed that it had to find the following three elements:

> (1) That two or more persons entered the unlawful agreement charged in Count One of the Indictment;[2]

---

[2] The jurors were also charged that in order to find Mr. Braddock guilty, they needed to find that the object of the conspiracy was

> (1) to knowingly and willfully cause the submission of a materially false, fictitious, and fraudulent statement and representation, that is, the submission by the Campaign Committee to the FEC of a report that was materially false in reporting the source and amount of contributions to the Campaign Committee; or (2) to defraud the United States by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of the FEC.

(Jury Instructions at 18.) The jury was instructed that it must find unanimously that at least one of these objects had been proved. Regarding the false statements object, the jury was charged that "[t]he Government is not required to prove that the defendant entered the agreement knowing that the false information would be provided to a federal agency. It is enough that he knew that the information was false, and that it did, in fact, go to a federal agency." (*Id.* at 19.) With respect to the defraud object, the jury was charged that "the Government must prove that the defendant agreed to defraud the United States by impairing or impeding the FEC. . . . [and] that the United States or one of its agencies or departments was the ultimate target of the conspiracy." (*Id.*)

(2) That at some point during the existence of the agreement, the defendant knowingly and willfully became a member of the conspiracy; and

(3) That during the course of the conspiracy, at least one of the members knowingly performed an overt act in order to further advance the common purpose of the conspiracy.

(Jury Instructions [Doc. # 249] at 14.)  Defendant argues that the only evidence of the unlawful agreement charged in the Indictment was presented through uncorroborated statements of cooperating witnesses at trial, and that this circumstantial evidence alone is insufficient evidence to show that such a conspiracy existed, or that Defendant joined it. Specifically, Mr. Braddock points out that during the time that the RYO legislation was under consideration, when the majority of the straw checks were provided to the Campaign Committee, he was not in contact with any of the alleged members of the campaign, nor did the evidence show that he was monitoring the progress of the RYO legislation through the General Assembly.  Defendant argues that this lack of communication with his alleged co-conspirators and concern regarding the RYO legislation illustrates that he could not have been a member of the conspiracy charged in Count One of the Indictment.

Notwithstanding Defendant's characterization of the Government's case, however, the evidence at trial, when viewed in the light most favorable to the Government, was sufficient to show that a conspiracy to cause the submission of false statements to the FEC and to defraud the United States existed, and that Mr. Braddock was a member of this conspiracy.  The jury heard the testimony of several cooperating witnesses, and dozens of recordings in which the RYO owners, Mr. Soucy, and members of the Campaign Committee discussed their plan to donate to Speaker Donovan's congressional campaign in exchange for his keeping the RYO legislation "off the table."

This testimony and these recordings laid out the decision of the conspirators to conceal the source of these contributions by submitting them in the form of conduit contributions through checks written by straw donors whom they reimbursed. The jury also heard testimony from several of the straw donors that they had been provided money by RYO owners to write out checks to the Campaign Committee. Special Agent Keelan corroborated the existence of this scheme in his testimony regarding his meetings with the RYO owners, Mr. Soucy, Mr. Nassi, and Mr. Braddock. The jury also saw evidence that these contributions had been provided in the form of the checks deposited by the Campaign Committee, and the FEC reports listing the names of the straw donors, rather than the RYO owners.

Thus, the jury had before it evidence that the alleged members of the conspiracy had agreed to and did use straw donors to provide false information regarding the source of contributions to a federal campaign in order to conceal from the public and from the FEC, the source of public information on federal campaign contributions, that the RYO industry had donated money to Speaker Donovan's congressional campaign. Even if the jury found that some of the alleged conspirators did not know about the process by which the information on the checks would be reported to the FEC, there still was sufficient evidence to conclude that a conspiracy to cause false statements existed. *See United States v. Bakhtiari*, 913 F.2d 1053, 1060 (2d Cir. 1990) ("[N]o mental state is required with respect to federal involvement in order to establish a violation of § 1001."). *Cf. United States v. Hsia*, 176 F.3d 517, 522–23 (D.C. Cir. 1999) (upholding the application of 18 U.S.C. §§ 1001 and 2(b) to a conduit contribution scheme and holding that a defendant need not know her conduct was unlawful to be found to have violated these statutes because "the simple interposition of conduits to sign the checks is certainly enough to

'cause' a committee to make false statements"). Therefore, the evidence at trial was sufficient to support the jury's finding that a conspiracy to submit false statements to the FEC and to defraud the United States existed.

The jury also heard evidence regarding Mr. Braddock's knowing and willful membership in the conspiracy. Mr. Soucy testified that he spoke with Mr. Braddock regarding the plan to funnel money to the Campaign Committee via conduit contributions on the evening of November 15, 2011, and the jury was entitled to credit this testimony. Mr. Soucy's description of the November 15, 2011 conversation was also corroborated by Mr. Rogers in a telephone recording (*see* Gov't's Ex. 1), and by an email from Mr. Braddock to Ms. Waterfall attributing the conduit contribution to Mr. Soucy (*see* Gov't's Exs. 6–8). Mr. Soucy testified at trial that he had always been open with Mr. Braddock regarding the conduit nature of the contributions, and in several of the recorded phone conversations between him and Mr. Braddock, Mr. Soucy mentioned that he put the cash for the checks directly into the hands of the conduit contributors (*see* Gov't's Exs. 70–71).

Furthermore, Special Agent Keelan testified that he had been open regarding the conduit contribution scheme when he provided straw checks to Mr. Braddock. The jury heard a recording of his meeting with Mr. Braddock and Mr. Nassi in which Special Agent Keelan stated that there were no duplicate contributors on the checks he had just provided, and that while his name wasn't on them, he could make a more "public showing" if they thought it would be helpful. (Gov't's Ex. 40.) The jury also heard recordings and testimony that Mr. Braddock's tone of voice was "urgent" when informed that one of the contributions had been made in the name of an RYO employee, instead of a straw donor, and that he acted quickly to stop the deposit of that check. (*See* Gov't's Ex.

73.) From this the jury was entitled to infer that Mr. Braddock intended to conceal the fact that RYO interests were contributing to the campaign, because he took swift action to prohibit the only check linking the donations to RYO money from being deposited or reported. Finally, the jury heard testimony from campaign employees not alleged to have participated in the conspiracy that Mr. Braddock understood that the information on the conduit contribution checks would be entered into the campaign's database and reported to the FEC. Thus, the jury did not have to rely on the testimony of cooperating witnesses alone, but rather had the testimony of an FBI Special Agent, uninvolved campaign employees, and Mr. Braddock's own statements in recorded calls to consider when determining whether Mr. Braddock had knowledge of the conduit nature of the contribution scheme. This evidence, when viewed in the light most favorable to the Government, was sufficient to support the jury's conclusion that Mr. Braddock knowingly and willfully joined the charged conspiracy.

2.      *Count Two – Knowingly and Willfully Accepting Conduit Contributions*

In order to find Mr. Braddock guilty of Count Two (Knowingly and Willfully Accepting Contributions Made by One Person in the Name of Another Person), the jury was instructed that it had to find the following five elements:

> (1) That the Campaign Committee was acting on behalf of a candidate seeking nomination or election to federal office, in this case, the United States House of Representatives;
> (2) That the defendant accepted or received contributions or caused another to accept or receive contributions on behalf of the Campaign Committee;
> (3) That the money for the contributions came from a source other than the person named as the contributor, and the defendant was aware of this;
> (4) That the defendant acted knowingly and willfully; and
> (5) That the aggregate amount of the contributions that the defendant accepted or received or caused the Campaign Committee to accept or receive exceeded $10,000 in the calendar year 2012.

(Jury Instructions at 24.) Mr. Braddock argues that there was insufficient evidence to show that he was aware of the conduit nature of the contributions checks provided by Mr. Soucy because the Government lacked direct evidence of his knowledge, and the only evidence from which the jury could have inferred such knowledge was the uncorroborated testimony of cooperating witnesses.

Again, Defendant minimizes the evidence that was presented to the jury. The jury heard direct evidence of Mr. Braddock's knowledge in the form of Mr. Soucy's testimony that he discussed with Mr. Braddock in some detail his plan to funnel RYO money to Speaker Donovan's congressional campaign via straw donors on the night of November 15, 2011. The jury also heard testimony from undercover FBI Special Agent Keelan that he had been similarly open regarding the conduit nature of the checks he handed to Mr. Braddock during an April 11, 2012 dinner meeting. The jury also heard a recording of this meeting corroborating Mr. Soucy's and Special Agent Keelan's testimony. (*See* Gov't Ex. 40.) Thus, the jury had more than just the testimony of cooperating witnesses to consider when evaluating the issue of Mr. Braddock's knowledge. Furthermore, the jury was able to consider recordings of telephone conversations between Mr. Soucy and Mr. Braddock in which Mr. Soucy talked openly about providing money to the straw donors who wrote checks to the campaign. (*See* Gov't's Exs. 70–71). The jury also heard a recording of a call in which Mr. Braddock sounded "urgent" when he was informed that one of the checks Mr. Soucy had provided to the campaign could be tied to the RYO owners (*see* Gov't Ex. 73), and Ms. Waterfall testified that he sounded similarly "urgent" when he rushed to pull the offending check from that day's deposit. While defense counsel argued that Mr. Braddock's responses during these phone calls could have been innocuous, based on the evidence before it, the jury was entitled to infer that Mr.

Braddock was confirming his knowledge of the straw nature of the checks Mr. Soucy had provided to the Campaign Committee, especially where he acted swiftly and urgently to remove the only check that could be tied to RYO interests from the record of the Campaign Committee's deposits. This evidence, when considered in the light most favorable to the Government, was sufficient to support the jury's finding that Mr. Braddock knew of the straw nature of the contributions he accepted from Mr. Soucy.

3.     *Count Three – Knowingly and Willfully Causing False Statements*

In order to find Mr. Braddock guilty of Count Three (Knowingly and Willfully Making False Statements), the jury was instructed that it had to find the following five elements:

> (1) That the defendant made or caused another to make the statement or representation charged in the Indictment;
> (2) That this statement or representation was material to the FEC;
> (3) That the statement or representation was false, fictitious, or fraudulent;
> (4) That the defendant acted knowingly and willfully; and
> (5) That the false, fictitious, or fraudulent statement concerned a matter that was within the jurisdiction of the FEC.

(Jury Instructions at 29.) Mr. Braddock argues that there was insufficient evidence that he either directly or indirectly provided false statements to the FEC, "especially when considering the trial testimony that he was not responsible in any way for submitting the data for FEC reports." (Def.'s Mem. Supp. at 3.)

Because Mr. Braddock was charged under both 18 U.S.C. § 1001 and the aiding and abetting statute, 18 U.S.C. § 2, the jury did not need to find that he was directly involved in preparing and submitting the Campaign Committee's reports to the FEC. *See United States v. Hopkins*, 916 F.2d 207, 215 (5th Cir. 1990) ("The Hopkins also contend that if false reports were made, they did not make them or cause them to be made. While it may be true that the Hopkins themselves did not make the reports, it is clear that they

deliberately caused those reports to contain false information. The evidence showed that by keeping him unaware of their scheme, the Hopkins caused another individual, the Treasurer of their political action committee, to report to the Federal Election Commission that the contributions to the political action committee were from individuals. It is well-established that 18 U.S.C. § 2(b) was designed to impose criminal liability on one who causes an intermediary to commit a criminal act, even though the intermediary who performed the act has no criminal intent and hence is innocent of the substantive crime charged." (internal citations and quotation marks omitted)); *see also Hsia*, 176 F.3d at 523 ("[T]he simple interposition of conduits to sign the checks is certainly enough to 'cause' a committee to make false statements in its report.");

Furthermore, the Government did present evidence that Mr. Braddock was involved in the process by which the campaign compiled the information for its FEC reports.  Ms. Waterfall testified that it was Mr. Braddock who had trained her for her job as assistant finance director, and that he had explained the principles of the FEC regulations with which the Campaign Committee was obligated to comply.  This testimony regarding Mr. Braddock's knowledge of FEC reporting requirements was consistent with his description of himself as a savvy and experienced campaign finance director.  (*See* Gov't's Ex. 124.)  Ms. Waterfall also testified that Mr. Braddock was her supervisor, and that he assigned her the task of entering contributor information into the campaign database from which FEC reports were generated.  Ms. Waterfall testified that Mr. Braddock understood the operation of the database and that they worked together to ensure that accurate information was entered into the database.  Mr. Freiser testified that there was no independent verification of the information once it was entered into the database.  Furthermore, the jury heard recordings in which Mr. Braddock spoke with Mr.

Soucy to determine the biographical information of the straw donors required for entry into the database. (*See, e.g.*, Gov't Exs. 67, 69–71, 73, 75.) Ms. Waterfall testified that she had asked Mr. Braddock to contact Mr. Soucy to get the required information in order to update the database. In one of the calls, Mr. Braddock stated that he had looked up one of the conduit contributor's information because he had to do "this reporting sh*t." (Gov't Ex. 70.) The jury was entitled to infer from this evidence that Mr. Braddock understood that by concealing the straw nature of the checks, false information would be entered into the campaign database when he turned those checks over to Ms. Waterfall, and that this false information would then be provided to the FEC. Thus, the evidence, when viewed in the light most favorable to the Government, is sufficient to support the jury's determination that Defendant was guilty of the charge contained in Count Three of the Indictment.

### 4. Spillover Prejudice

Defendant also argues generally that the jury's guilty verdict was based on spillover prejudice resulting from the voluminous evidence against other defendants in the case. Specifically, Mr. Braddock argues that his trial devolved into a referendum on the guilt or innocence of Speaker Donovan, thereby clouding the actual issues that the jury was tasked with deciding. However, the jury was instructed as follows:

> You are not being asked to determine whether any other person has been proven guilty. Your verdict should be based solely upon the evidence or lack of evidence as to the defendant, Mr. Robert Braddock, Jr. in accordance with my instructions and without regard to whether the guilt of other people has or has not been proven.

(Jury Instructions at 7.) "A jury is presumed to follow its instructions," *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and the Court sees no reason to think that this jury was unwilling or unable to follow this instruction. Furthermore, while there was certainly

evidence of other individuals' guilt presented at trial, despite Defendant's characterization of the Government's case, the jury was also able to consider evidence relating directly to Mr. Braddock's culpability. As discussed above, the jury heard testimony from cooperating witnesses, an undercover FBI agent, and campaign employees who were not alleged to have been involved in the conspiracy regarding Mr. Braddock's actions, knowledge, and statements during the campaign. Furthermore, the jurors listened to dozens of recordings of Mr. Braddock's own statements, which they could consider before reaching their verdict.

Defendant argues that this amounted to no more than circumstantial evidence of his knowledge and intent regarding the charged crimes, and that "there are times that [circumstantial evidence] amounts to only reasonable speculation and not to sufficient evidence." *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008). However, "the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom. In fact, a verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable." *United States v. Robinson*, 702 F.3d 22, 36 (2d Cir. 2012) (internal citations and quotation marks omitted). Based on Mr. Braddock's acknowledgment of Mr. Soucy's and Special Agent Keelan's descriptions of the straw nature of the contributions, his statements to the RYO owners that they would "be fine," his actions in preventing Mr. Hogan's check from being deposited, and Ms. Waterfall's testimony that he understood that the information on the checks would be entered into the campaign's database and reported to the FEC, it was reasonable for the jury to infer that Mr. Braddock had knowledge of the straw nature of the contributions and acted

knowingly and willfully in accepting those contributions and allowing them to be reported to the FEC.

Defendant argues that such an inference ignores the equally plausible conclusion that Mr. Braddock's responses to the statements of his alleged co-conspirators are consistent with his lack of knowledge regarding the conduit nature of the contributions. For example, Mr. Braddock claims that the Government placed too much emphasis on his statement that the RYO owners would "be fine," without acknowledging that it was illogical for him to make such a statement at a public event if he really were participating in a conspiracy. Furthermore, he argues that interpreting this as an acknowledgment of the conduit contribution scheme ignores the lack of evidence showing that Mr. Braddock had very little communication with the alleged co-conspirators, even at the height of the alleged conspiracy. However, "[t]he possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to [a] sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005). Defendant's motion for judgment of acquittal is therefore denied.

**B. New Trial**

Defendant's motion for a new trial "is based upon substantially the same grounds as his Rule 29 motion." (Def.'s Mem. Supp. at 5.) Specifically, Mr. Braddock argues that the evidence at trial preponderates against the jury's guilty verdict because it does not prove he acted "knowingly." While the Court is free to reject testimony that is "patently incredible or defies physical realities, . . . the trial judge's rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial." *Sanchez*, 969 F.2d at 1414. "The test is whether it would be a manifest injustice to

let the guilty verdict stand." *Id.* (internal citations and quotation marks omitted). Here, the Court sees no reason to reject the testimony of the cooperating witnesses. Although they certainly had a personal interest in giving testimony against Mr. Braddock, their testimony was generally corroborated by the testimony of witnesses not involved in the conspiracy, including that of Special Agent Keelan and Ms. Waterfall, and by the recordings. As discussed above, there was sufficient evidence based on which a jury could infer that Defendant acted knowingly. Even when viewing the testimony of the cooperating witnesses with a skeptical eye, the Court does not believe that the evidence presented at trial preponderates against the jury's guilty verdict. The Court is not persuaded by Mr. Braddock's proffered explanation of his questionable conduct as innocent responses to veiled references to criminality of which he was unaware. Therefore the Court concludes that the jury's verdict does not represent a "manifest injustice," and Mr. Braddock's motion for a new trial is thus denied.

III. **Conclusion**

For the reasons discussed above, Defendant's Motions [Doc. ## 260, 261] for Judgment of Acquittal and for a New Trial are DENIED.


IT IS SO ORDERED.

      /s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 14th day of August, 2013.


23